AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>grey Apple iPhone 12, with serial number<br>G6TFMGJ10D80, IMEI number<br>358522145066107, and phone number (562)<br>399-2955, CURRENTLY LOCATED AT 650<br>Capitol Mall, Suite 3-100, Sacramento, CA | )<br>)<br>)<br>)<br>)<br>) |

```
FILED
Jan 13, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
```

Case No.  2:23-sw-0023 JDP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252A(a)(2)&(5) | Possession and Receipt of Child Pornography |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Craig Squire
*Applicant's signature*

HSI Special Agent Craig Squire
*Printed name and title*

Sworn to me and signed telephonically.

Date:  __January 13, 2023__

City and state:  __Sacramento, California__

*Judge's signature*

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

1  PHILLIP A. TALBERT
   United States Attorney
2  EMILY G. SAUVAGEAU
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile:  (916) 554-2900
5
6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11 | In the Matter of the Search of: | CASE NO. |
12 | A grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, Currently Located at 650 Capitol Mall, Suite 3-100, Sacramento, CA | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH DEVICE |
13
14
15

16         I, Craig Squire, a Special Agent with the U.S. Department of Homeland Security, Homeland

17 Security Investigations ("HSI") being first duly sworn, hereby depose and state as follows:

18                     **I.    INTRODUCTION**

19         1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

20 Criminal Procedure for a search warrant authorizing the examination of a grey Apple iPhone 12, with

21 serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955

22 (the "Subject Device"), which is further described in Attachment A and is currently in law enforcement

23 possession, and the extraction from that property of electronically stored information described in

24 Attachment B.

25         2.      This affidavit is submitted in connection with an investigation into the possession of child

26 exploitation material.  HSI is in lawful possession of the Subject Device which was seized from Julio

27 NEVAREZ-ERUNEZ during execution of a federal arrest warrant on October 6, 2022.  NEVAREZ-

28 ERUNEZ signed a consent form for law enforcement to search the Subject Device, and law enforcement

also obtained a search warrant for the Subject Device.  (2:22-sw-0703-JDP.)  Pursuant to the previous

federal search warrant, which is attached as Attachment C and incorporated herein by reference, HSI has

already conducted a forensic review of the Subject Device in searching for evidence of violations of 21

U.S.C. §§ 841(a)(1), 846.  During this review, the government encountered, in plain view, suspected

child exploitation material.  As detailed below, there is probable cause to believe that the Subject Device

was used to receive and possess child exploitation material, in violation of 18 U.S.C. § 2252A(a)(2).

Because the original warrant allowed law enforcement to search the device for violations of 21 U.S.C.

§§ 841(a)(1), 846, I seek this additional warrant in order to further search the Subject Device and its

forensic extraction for violations of 18 U.S.C. § 2252A(a)(2).

3.     The statements contained in this affidavit come from my personal observations, my

training and experience, and information obtained from other law enforcement officers.  I am familiar

with the information contained in this Affidavit based upon the investigation I have conducted and based

on information provided to me by other law enforcement officers and Computer Forensic Analysts

(CFA), which I have reviewed.

## II.     AGENT BACKGROUND

4.     I have been employed as a Special Agent of the U.S. Department of Homeland Security

Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") since

November 2007, and am currently assigned to HSI Sacramento.  While employed by HSI, I have

investigated federal criminal violations related to high technology or cybercrime, human trafficking,

child sexual abuse material/child exploitation material ("CSAM/CEM").  I have gained experience by

successfully completing the Criminal Investigator Training Program at the Federal Law Enforcement

Training Center in Glynco, Georgia, the ICE Special Agent Training program, advanced training, and

everyday work relating to conducting these types of investigations.  I have been a Special Agent for the

past fifteen  years and am a federal law enforcement officer who is engaged in enforcing criminal laws,

including 18 U.S.C. §§ 2252, and 2252A, and I am authorized by law to request a search warrant.  In the

course of my employment, I have served or assisted in serving search warrants, seized numerous items

of computer equipment and digital evidence, and I have conducted several investigations involving

computer forensics, including investigations related to CSAM/CEM.  Through cyber tips, field

investigations and forensic reviews, I have reviewed numerous examples of CSAM/CEM (as defined in 18 U.S.C. § 2256) in all forms of media.  Moreover, I have worked closely with HSI forensic examiners during these investigations and prosecutions.

5.  I have conducted and participated in criminal investigations for violations of federal and state laws including narcotics trafficking, CSAM/CEM, money laundering, and other organized criminal activity.  I have prepared, executed, and assisted in numerous search and arrest warrants.  I have also conducted and participated in criminal and administrative interviews of witnesses and suspects.  I am familiar with the formal methods of child exploitation investigations, including electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, and the use of undercover agents.  I have participated in investigations of possession, distribution, receipt, and production of CSAM.

6.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

### III.   IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.  The property to be searched is a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955 (the "Subject Device") and the forensic extraction thereof.  The Subject Device and its forensic extraction are currently located at 650 Capitol Mall, Suite 3-100, Sacramento, CA.

8.  The applied-for warrant would authorize the forensic examination of the Subject Device and its forensic extraction for the purpose of identifying electronically stored data particularly described in Attachment B.

### IV.   PROBABLE CAUSE

9.  In July 2022, law enforcement arranged for a confidential informant ("CI") to make a controlled purchase of fifteen pounds of methamphetamine from Julio NEVAREZ-ERUNEZ.  The CI and NEVAREZ-ERUNEZ arranged for NEVAREZ-ERUNEZ to bring up fifteen pounds of methamphetamine for a price of $1200 per pound on Wednesday, July 13, 2022.

10.  On July 13, 2022, at approximately 9:13 a.m., surveilling law enforcement officers saw NEVAREZ-ERUNEZ and NIEBLA-OSUNA walk out of their apartment complex in Downey, California and toward a gray/silver Honda Civic, registered to Julia Nevarez-Erunez.  NEVAREZ-

ERUNEZ carried a white cardboard box and placed it in the Honda Civic, and NEVAREZ-ERUNEZ and NIEBLA-OSUNA drove off in the Honda Civic together to Sacramento, California. At approximately 3:05 p.m., the CI and surveilling law enforcement officers saw the Honda Civic pull into the pre-determined meet location. NEVAREZ-ERUNEZ and NIEBLA-OSUNA sold fifteen pounds of crystal methamphetamine to the CI. The methamphetamine was sent to the DEA lab for testing. DEA lab results confirmed that the substance was, in fact, methamphetamine.

11.     Based in part on the foregoing, the Honorable Kendall J. Newman signed a Criminal Complaint and arrest warrants charging NEVAREZ-ERUNEZ and NIEBLA-OSUNA with possession with intent to distribute methamphetamine (2:22-mj-0142-KJN).

12.     On October 6, 2022, law enforcement officers arrested NEVAREZ-ERUNEZ in Sacramento, California. NEVAREZ-ERUNEZ was in possession of forty pounds of methamphetamine and approximately 5,000 pills containing fentanyl, as confirmed by DEA lab testing. Law enforcement searched NEVAREZ-ERUNEZ incident to arrest and found and seized the Subject Device.

13.     Post-*Miranda*, NEVAREZ-ERUNEZ agreed to speak with law enforcement and signed a consent form for law enforcement to search the Subject Device. Out of an abundance of caution, law enforcement also obtained a search warrant to search the Subject Device for evidence of violations of 21 U.S.C. §§ 841(a)(1), 846. (2:22-sw-0703-JDP.) On October 6, 2022, at the HSI Sacramento computer forensic lab, Computer Forensic Analyst Victor Reyes conducted a forensic extraction using Cellebrite software of an Apple iPhone 12 Pro. The identification for the iPhone 12 Pro was A2341MGKJ3LL/A.

14.     On January 13, 2023, law enforcement and the government were reviewing the forensic extraction of the Subject Device during a conference call. An attorney for the government saw in plain view one file depicting what appears to be child pornography. The government attorney told HSI Special Agent Nelson Torres where the file was located and stopped reviewing the forensic extraction. I have since reviewed the file, which is described as follows:

Filepath:

Julio'siPhone/mobile/Containers/Shared/AppGroup/group.net.whatsapp.WhatsApp.shared/Messages/Media/120363040169689379@g.us/0/6/06df5693-adc5-4022-b871-

3284d7702d18.wp

The file is a Sticker image posted by "Yo soy Tu Carnicero" to a chat group with forty-three members on 5/16/2022 at 12:04:43 PM(UTC-7).  The posted image is of a white/Hispanic male infant.  The infant has an exposed penis and is wearing a black and white horizontally striped shirt with turquois sleeves.  The infant has brown hair and is being fed by bottle which obscures his face.  The infant's right hand is holding the bottle and his left hand is touching his exposed genitals.  The camera angle focuses on the infant's genitals.

15.    I have reviewed the above Sticker image and I believe it is child pornography as defined by 18 U.S.C. § 2256(8).

16.    The Subject Device is currently in storage at 650 Capitol Mall, Suite 3-100, Sacramento, CA.  In my training and experience, I know that the Subject Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Device first came into the possession of the Homeland Security Investigations.

## V.    CHARACTERISTICS COMMON TO INDIVIDUALS WHO RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

17.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess and/or access with intent to view child pornography:

a)    Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b)    Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children

or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c)      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d)      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e)      Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

f)      Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including e-mail addresses), usernames/user handles, and telephone numbers of individuals with whom they have

1    been in contact and who share the same interests in child pornography.

2    g)    Such individuals prefer not to be without their child pornography for any prolonged time

3          period.  This behavior has been documented by law enforcement officers involved in the

4          investigation of child pornography throughout the world.  It is more likely than not that

5          evidence of this access will be found on the Subject Device.

6    ## VI.    TECHNICAL TERMS

7    18.    Based on my training and experience, I use the following technical terms to convey the

8    following meanings:

9    a)    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is

10         a handheld wireless device used for voice and data communication through radio signals.

11         These telephones send signals through networks of transmitter/receivers, enabling

12         communication with other wireless telephones or traditional "land line" telephones.  A

13         wireless telephone usually contains a "call log," which records the telephone number,

14         date, and time of calls made to and from the phone.  In addition to enabling voice

15         communications, wireless telephones offer a broad range of capabilities.  These

16         capabilities include: storing names and phone numbers in electronic "address books;"

17         sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

18         storing still photographs and moving video; storing and playing back audio files; storing

19         dates, appointments, and other information on personal calendars; and accessing and

20         downloading information from the Internet.  Wireless telephones may also include global

21         positioning system ("GPS") technology for determining the location of the device.

22   b)    Digital camera:  A digital camera is a camera that records pictures as digital picture files,

23         rather than by using photographic film.  Digital cameras use a variety of fixed and

24         removable storage media to store their recorded images.  Images can usually be retrieved

25         by connecting the camera to a computer or by connecting the removable storage medium

26         to a separate reader.  Removable storage media include various types of flash memory

27         cards or miniature hard drives.  Most digital cameras also include a screen for viewing

28         the stored images.  This storage media can contain any digital data, including data

1   unrelated to photographs or videos.

2   c)   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld

3        digital storage device designed primarily to store and play audio, video, or photographic

4        files.  However, a portable media player can also store other digital data.  Some portable

5        media players can use removable storage media.  Removable storage media include

6        various types of flash memory cards or miniature hard drives.  This removable storage

7        media can also store any digital data.  Depending on the model, a portable media player

8        may have the ability to store very large amounts of electronic data and may offer

9        additional features such as a calendar, contact list, clock, or games.

10  d)   GPS:  A GPS navigation device uses the Global Positioning System to display its current

11       location.  It often contains records the locations where it has been.  Some GPS navigation

12       devices can give a user driving or walking directions to another location.  These devices

13       can contain records of the addresses or locations involved in such navigation.  The Global

14       Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites

15       orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite

16       repeatedly transmits by radio a mathematical representation of the current time, combined

17       with a special sequence of numbers.  These signals are sent by radio, using specifications

18       that are publicly available.  A GPS antenna on Earth can receive those signals.  When a

19       GPS antenna receives signals from at least four satellites, a computer connected to that

20       antenna can mathematically calculate the antenna's latitude, longitude, and sometimes

21       altitude with a high level of precision.

22  e)   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for

23       storing data (such as names, addresses, appointments or notes) and utilizing computer

24       programs.  Some PDAs also function as wireless communication devices and are used to

25       access the Internet and send and receive e-mail.  PDAs usually include a memory card or

26       other removable storage media for storing data and a keyboard and/or touch screen for

27       entering data.  Removable storage media include various types of flash memory cards or

28       miniature hard drives.  This removable storage media can store any digital data.  Most

PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

g)   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

19.   Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VII.   ELECTRONIC STORAGE AND FORENSIC ANALYSIS

20.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

21.   There is probable cause to believe that things that were once stored on the Subject Device may still be stored there, for at least the following reasons:

a)   Based on my knowledge, training, and experience, I know that computer files or

1    remnants of such files can be recovered months or even years after they have been

2    downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

3    downloaded to a storage medium can be stored for years at little or no cost.  Even when

4    files have been deleted, they can be recovered months or years later using forensic tools.

5    This is so because when a person "deletes" a file on a computer, the data contained in the

6    file does not actually disappear; rather, that data remains on the storage medium until it is

7    overwritten by new data.

8    b)    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

9    space-that is, in space on the storage medium that is not currently being used by an active

10    file-for long periods of time before they are overwritten.  In addition, a computer's

11    operating system may also keep a record of deleted data in a "swap" or "recovery" file.

12    c)    Wholly apart from user-generated files, computer storage media-in particular, computers'

13    internal hard drives-contain electronic evidence of how a computer has been used, what it

14    has been used for, and who has used it.  To give a few examples, this forensic evidence

15    can take the form of operating system configurations, artifacts from operating system or

16    application operation, file system data structures, and virtual memory "swap" or paging

17    files.  Computer users typically do not erase or delete this evidence, because special

18    software is typically required for that task.  However, it is technically possible to delete

19    this information.

20    d)    Similarly, files that have been viewed via the Internet are sometimes automatically

21    downloaded into a temporary Internet directory or "cache."

22    22.    <u>Forensic evidence.</u>  As further described in Attachment B, this application seeks

23    permission to locate not only electronically stored information that might serve as direct evidence of the

24    crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was

25    used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic

26    electronic evidence might be on the Subject Device because:

27    a)    Data on the storage medium can provide evidence of a file that was once on the storage

28    medium but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b)    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f)    I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an

instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

23.     <u>Nature of examination.</u>  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24.     <u>Manner of execution.</u>  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VIII.     <u>CONCLUSION</u>

25.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

///
///
///
///
///
///
///
///
///
///

26.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation, and the target is not aware of all of the objects of the investigation.  Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Craig Squire

Craig Squire
Special Agent
Homeland Security Investigations

Subscribed and sworn to me
telephonically on:

January 13, 2023

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE

_/s/ Emily G. Sauvageau_
Approved as to form by
AUSA Emily G. Sauvageau

## **ATTACHMENT A**

The property to be searched is a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, hereinafter the "Subject Device." The Subject Device is currently located at 650 Capitol Mall, Suite 3-100, Sacramento, CA.

This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records on the Subject Device described in Attachment A that relate to violations of 18 U.S.C. § 2252A(a)(2)&(5) and involve Julio NEVAREZ-ERUNEZ, including:

a.  Visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or describing such conduct;

b.  Video recordings of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

c.  Information, electronic records, or correspondence pertaining to the possession, receipt, or distribution of visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

d.  Information regarding social-networking Internet sites or peer-to-peer networks and participants in such sites or networks;

e.  Correspondence including, but not limited to electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

f.  Records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.  Credit card information, including bills and payment records showing subscriptions, membership payments, purchases, or sales of visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or for access to such material.

h.  Records, electronic or otherwise, or other items that relate to peer-to-peer software or networks, or to use of such software or networks by individuals who exhibit a sexual interest in children.  Evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

i.  Evidence of who used, owned, or controlled the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, electronically-stored photographs, and correspondence;

j.  Any and all stored information that can be retrieved and investigated for evidentiary value, inculpatory or exculpatory, and/or identify co-conspirators, and identify any investigatory leads.

2.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT C**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

> **FILED**
>
> **Oct 12, 2022**
>
> CLERK, U.S. DISTRICT COURT
> EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of      )
a grey Apple iPhone 12, with serial number    )
G6TFMGJ10D80, IMEI number    )
358522145066107, and phone number (562)    )
399-2955, CURRENTLY LOCATED AT HSI    )
Sacramento    )

Case No.     2:22-sw-0703 JDP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a), 846 | Conspiracy to distribute and possess with intent to distribute methamphetamine |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Nelson S. Torres
*Applicant's signature*

Nelson S. Torres, HSI Special Agent
*Printed name and title*

Sworn to me and signed telephonically.

Date: _____ October 12, 2022 _____

_____
*Judge's signature*

City and state:   Sacramento, California

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

**Affidavit In Support of an Application for a Warrant to Search Device**

I, Nelson S. Torres, being first duly sworn, depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Homeland Security Investigations ("HSI"), and have been since 2015.  Previously, I was a Border Patrol Agent of the Customs Border Protection in Pine Valley, California for approximately eight years.

3.     I have received specialized training in narcotic investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal.  In total, I have received over 20 hours of comprehensive formalized classroom instruction in those areas outlined above.

4.     I have assisted in the execution of more than 50 warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia and other evidence of violations of federal drug narcotics statutes.  As a result, I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture, and distribute controlled substances.  I have been actively involved as case agent in over 50 investigations and have talked with confidential informants involved in the trafficking of narcotics.

5.     Through my training and experience, I know that narcotics traffickers use mobile telephone to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other people involved in

1

narcotics trafficking.  Mobile telephones also contain an address book, where users store contacts.  The information stored in a telephone used by a narcotics trafficker is evidence of who the trafficker associates with, some of whom are related to his or her trafficking operation.

6.      Through my training and experience, I know that mobile telephones store text messages sent, received, and drafted by the user.  The text message history in a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or plans of a narcotics trafficker and his or her associates and contacts.  Mobile telephones also receive and store voicemails and call records, which shows who is calling the user, and may explain why they are calling. Mobile telephones have other user-entered data files, such as "notes" and "to-do lists," which can provide evidence of a crime when a narcotics trafficker stores data related to the crime using those files.  Mobile telephone companies also store the data described in this paragraph on their servers and associate the data with particular users' mobile telephones.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## II.      IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.      The property to be searched is: a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, hereinafter the "Device."  The Device is currently in the custody of Homeland Security Investigations, located at 650 Capitol Mall in Sacramento, California.

9.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## III.      SUMMARY OF PROBABLE CAUSE

10.      In 2022, I along with other agents of HSI, the Drug Enforcement Administration ("DEA"), and other supporting agencies investigated Julio NEVAREZ-

ERUNEZ and Juan NIEBLA-OSUNA for methamphetamine trafficking.  During the investigation, NEVAREZ-ERUNEZ used phone number (562) 399-2955 to communicate with a confidential informant and arrange narcotics transactions.  On October 6, 2022, law enforcement arrested NEVAREZ-ERUNEZ pursuant to a federal arrest warrant and found NEVAREZ-ERUNEZ in possession of forty pounds of methamphetamine, five thousand blue pills, and a mobile telephone.

## IV.  FACTS IN SUPPORT OF PROBABLE CAUSE

11.    In July 2022, law enforcement arranged for a confidential informant ("CI") to make a controlled purchase of fifteen pounds of methamphetamine from Julio NEVAREZ-ERUNEZ.

12.    A "controlled purchase" is a drug transaction conducted by a confidential source and/or an undercover officer under the direction of law enforcement for the purpose of acquiring evidence of drug trafficking against the target subjects.  Immediately before the controlled purchases detailed below, the CI met with handling law enforcement agents.  Law enforcement searched the CI for contraband and found none.  Law enforcement equipped the CI with covert audio/video recording/transmitting devices and U.S. currency funds for the operation.  After briefing the CI for the controlled purchases, the CI then moved to the controlled purchase location under law enforcement surveillance.

13.    During the controlled purchases, the CI's interactions with NEVAREZ-ERUNEZ and NIEBLA-OSUNA were recorded by one or more covert devices and observed by surveilling law enforcement officers when possible.  After the controlled purchases, the CI returned to meet with law enforcement at a pre-determined location, who retrieved from the CI the methamphetamine acquired as well as the transmitting/recording devices.  Law enforcement then searched the CI for unexplained contraband and found none.

14.    Law enforcement gave the CI a phone number, (562) 399-2955, which is subscribed to Julia Nevarez-Erunez at 11527 Downey Ave, Apt. 2, Downey, CA and used by Julio Cesar NEVAREZ-ERUNEZ ("the -2955 number").  Julia and Julio NEVAREZ-ERUNEZ are siblings.  The CI and NEVAREZ-ERUNEZ exchanged calls and text

3

messages over the phone while NEVAREZ-ERUNEZ was using the -2955 number.  Law enforcement recorded these calls and text messages and verified the call records through toll records.

15.     On July 6, 2022, the CI called NEVAREZ-ERUNEZ and asked about buying fifteen pounds of methamphetamine.  The CI and NEVAREZ-ERUNEZ arranged for NEVAREZ-ERUNEZ to bring up fifteen pounds of methamphetamine for a price of $1200 per pound on Wednesday (July 13, 2022) the following week.

16.     On Monday, July 11, 2022, NEVAREZ-ERUNEZ called the CI to confirm the date, time, and quantity for the deal.  NEVAREZ-ERUNEZ confirmed that he had fifteen pounds of methamphetamine ready to sell to the CI.  The two agreed to meet on Wednesday afternoon.  On Tuesday, July 12, 2022, NEVAREZ-ERUNEZ texted the CI to confirm the time—approximately 2:00 p.m. the following day.

17.     On July 13, 2022, at approximately 9:13 a.m., surveilling law enforcement officers saw NEVAREZ-ERUNEZ and NIEBLA-OSUNA walk out of the apartment complex and toward a gray/silver Honda Civic, registered to Julia Nevarez-Erunez. NEVAREZ-ERUNEZ carried a white cardboard box and placed it in the Honda Civic, and NEVAREZ-ERUNEZ and NIEBLA-OSUNA drove off in the Honda Civic together to Sacramento, California.  At approximately 9:38 a.m., NEVAREZ-ERUNEZ texted the CI and said he was on the way but running late.  It takes approximately six hours to drive from Downey, California to Sacramento.

18.     At approximately 1:59 p.m., NEVAREZ-ERUNEZ called the CI and said he was about an hour and a half away.  NEVAREZ-ERUNEZ asked the CI to send him the address for the meet location.  The CI texted NEVAREZ-ERUNEZ "8136 Delta Shores S Sacramento," and said "Detras del cine," which means, "behind the movie theater" (the "meet location").

19.     At approximately 3:05 p.m., the CI and surveilling law enforcement officers saw the Honda Civic pull into the meet location.  NEVAREZ-ERUNEZ and NIEBLA-OSUNA sold fifteen pounds of crystal methamphetamine to the CI.  The

methamphetamine was sent to the DEA lab for testing.  DEA lab results confirmed that the substance was, in fact, methamphetamine.

20.     After the July 13, 2022 controlled purchase, NEVAREZ-ERUNEZ used the -2955 number to contact the CI regarding future drug deals.

a)      On July 14, 2022, NEVAREZ-ERUNEZ texted the CI and asked if the CI was pleased with the methamphetamine.  The CI said it was nice and s/he hoped to do more deals with NEVAREZ-ERUNEZ soon.  NEVAREZ-ERUNEZ said that line of product was pure, and that the CI would not find flaws in it.

b)      On July 24, 2022 and August 2, 2022, NEVAREZ-ERUNEZ texted the CI to check in.  The CI and NEVAREZ-ERUNEZ do not have a relationship outside of their methamphetamine deals. In context and based on my training and experience, I believe NEVAREZ-ERUNEZ was reaching out to the CI to see if s/he would purchase more controlled substances.

c)      On August 3, 2022, NEVAREZ-ERUNEZ texted the CI, "oiga y se me habia olvidado decirle pero los números van parraiba," meaning, "hey, I forgot to tell you, but the numbers are going up." In context and based on my training and experience, I know that "los números," or the numbers, was a reference to the price per pound of methamphetamine.  The CI asked what the numbers were and why they went up.  NEVAREZ-ERUNEZ said, "pues por ahorita a 1300 oiga nos subieron de una a nosotros porque aya abajo subieron," meaning, "well, the price went up to 1300 for now because they raised the prices down there."

d)      On August 15, 2022, NEVAREZ-ERUNEZ texted the CI looking for an update.  The CI asked if NEVAREZ-ERUNEZ had time for a phone call. The CI and NEVAREZ-ERUNEZ spoke on the phone.  The CI said s/he was waiting for a call from his/her boss regarding another order.  The CI asked if the product would be the same as last time, and NEVAREZ-ERUNEZ confirmed.  The CI told NEVAREZ-ERUNEZ to give him/her a few more days

and s/he would let NEVAREZ-ERUNEZ know when s/he was ready to place an order.

e)      On August 22, 2022, the CI texted NEVAREZ-ERUNEZ asking for the price per pound of methamphetamine, and NEVAREZ-ERUNEZ said it was "1300." NEVAREZ-ERUNEZ and the CI talked on the phone and NEVAREZ-ERUNEZ said the price only went up "uno," meaning one hundred dollars per pound.  The CI said s/he would be in touch in the next couple days to place an order; NEVAREZ-ERUNEZ said whenever you need it, let me know.

f)      On August 30, 2022, NEVAREZ-ERUNEZ offered to connect the CI with someone who could sell the CI blue pills in the Sacramento area. At approximately 7:54 a.m., NEVAREZ-ERUNEZ texted the CI, "ahí unas pitufas ahí donde está usted baratas también," which means, "there are some smurfs there where you are; cheap, too." In context and based on my training and experience, I believe "pitufas," or smurfs, was a reference to blue, counterfeit oxycodone pills, and that NEVAREZ-ERUNEZ was offering to connect the CI with one of NEVAREZ-ERUNEZ's associates in Sacramento who would sell the pills.

g)      Law enforcement directed the CI to set up a controlled purchase for 2,000 blue pills and to ask NEVAREZ-ERUNEZ to connect the CI to the blue pill supplier.  After a series of calls and text messages between NEVAREZ-ERUNEZ and the CI, NEVAREZ-ERUNEZ said that his friend had sold everything and would not be able to sell to the CI at that time.

21.     In September 2022, NEVAREZ-ERUNEZ agreed to cell the CI thirty pounds of methamphetamine and five thousand blue pills.

a)      On September 7, 2022, the CI texted NEVAREZ-ERUNEZ, "compa que dices ya pronto te avisare para la nenas posiblemente agarre 25," which means, "friend, what do you say, I will let you know soon about the girls, I will take possibly 25." Based on my training and experience and my knowledge of prior

communications in this investigation, I believe "girls" was a reference to methamphetamine, and that "25" was a reference to twenty-five pounds. NEVAREZ-ERUNEZ texted back and said that he was ready whenever the CI wanted.

b)   On September 11, 2022, NEVAREZ-ERUNEZ called the CI from (562) 399-2955, but the CI did not answer.  The CI followed up with a text saying that he had an emergency at work but would get back to NEVAREZ-ERUNEZ soon.

c)   On September 26, 2022, at approximately 6:40 p.m., NEVAREZ-ERUNEZ called the CI.  During the conversation, the CI and NEVAREZ-ERUNEZ arranged a methamphetamine sale for the following week. NEVAREZ-ERUNEZ wanted to know if it was going to be the same amount that was discussed before.  The CI said that he/she would advise NEVAREZ-ERUNEZ how much he/she needed on Monday (October 3, 2022).  NEVAREZ-ERUNEZ asked the CI to give him a one- or two-day notice to prepare.

d)   On September 29, 2022, SA Huerta conducted surveillance on the apartment complex located at 11517 and 11527 Adco Ave, Downey, CA. SA Huerta saw NIEBLA-OSUNA arrive in a red 2015 Hyundai Sonata, bearing temporary California license plate BN96H82 and VIN 5NPE24AFXFH089288, registered to Robin Heathcoat,11517 Adco Avenue, Apartment 8, Downey, CA ("the Hyundai Sonata").  NEIBLA-OSUNA parked in the parking stall where law enforcement had previously seen the Honda Civic parked.  Surveilling officers saw NIEBLA-OSUNA walk into the apartment complex and toward the Downey address.  Law enforcement saw that the Honda Civic was also parked on a curb near the Downey address.

e)   On October 1, 2022, the CI texted NEVAREZ-ERUNEZ to check in.  At approximately 6:27 p.m., NEVAREZ-ERUNEZ and the CI spoke over the phone.  The CI asked about the price per pound of methamphetamine, and

7

NEVAREZ-ERUNEZ said "1300." The CI asked if s/he could get a lower price if s/he ordered more, meaning a larger quantity of methamphetamine. NEVAREZ-ERUNEZ said yes, he would ask, but if anything he could probably get the CI a deal for $1200 or $1250. The CI said s/he would like thirty, meaning 30 pounds.

f)    After the phone call, at approximately 6:41 p.m., NEVAREZ-ERUNEZ texted the CI and said, "Alas 12.50 llega el camion viejon." Translated literally, this means, "the truck is coming at 12:50." In context and based on my training and experience, I believe NEVAREZ-ERUNEZ was confirming that the price per pound of methamphetamine would be $1250. NEVAREZ-ERUNEZ then texted the CI and confirmed that NEVAREZ-ERUNEZ is ready to complete the transaction on Thursday.

22.    After confirming the methamphetamine deal, NEVAREZ-ERUNEZ offered to sell the CI blue pills.

a)    On October 1, 2022, at approximately 7:21 p.m., NEVAREZ-ERUNEZ texted the CI, "ahí tengo 5 de esas pelotitas si las agarra juntos con las niñas se las dejo a 1." Translated literally, this means, "I have five of those little balls there if you want to grab them together with the girls; I will leave it at one."

b)    In the context of this investigation and based on my training and experience, I believe NEVAREZ-ERUNZEZ was offering to sell counterfeit blue pills to the CI. Further, I believe that when NEVAREZ-ERUNEZ said he had "5," he was referencing 5,000 pills; when NEVAREZ-ERUNEZ said he would leave them at "1", I believe NEVAREZ-ERUNEZ was conveying that he would leave the price at $1 per pill if the CI purchased the pills together with the methamphetamine. In previous conversations during this investigation, the CI and NEVAREZ-ERUNEZ referred to methamphetamine as "las niñas," or "girls," and referred to counterfeit blue oxycodone pills as "pintufas," or "smurfs."

c)    To confirm that NEVAREZ-ERUNEZ was offering to sell the CI "pintufas," or "smurfs," a reference to counterfeit blue pills, law enforcement directed the CI to reply to NEVAREZ-ERUNEZ and ask.  The CI responded to NEVAREZ-ERUNEZ by texting, "Me hablas de las pintufas verdad?" which means, "you're talking to me about smurfs, right?"  NEVAREZ-ERUNEZ said "si señor," meaning, "yes sir."  The CI confirmed s/he would take the pills, and NEVAREZ-ERUNEZ said he would bring them up together with "las niñas," which is in reference to the thirty pounds of methamphetamine.

d)    On October 3, 2022, SA Huerta conducted surveillance near the apartments located at 11517 and 11527 Adco Ave, Downey, CA.  SA Huerta saw NEVAREZ-ERUNEZ leave 11527 Adco Ave, Apartment 2, in the Hyundai Sonata.  SA Huerta also saw NIEBLA-OSUNA leave the Downey address in the Honda Civic.

23.    Based in part on the foregoing, the Honorable Kendall J. Newman signed a Criminal Complaint and arrest warrants charging NEVAREZ-ERUNEZ and NIEBLA-OSUNA with possession with intent to distribute methamphetamine.  (2:22-mj-0142-KJN)

24.    On October 6, 2022, NEVAREZ-ERUNEZ drove to Sacramento, California to sell narcotics to the CI.

a)    At approximately 4:22 a.m., law enforcement officers were surveilling 11527 Adco Ave, Apartment 2, Downey, CA when they saw a 2022 grey Kia Forte, bearing California license plate 9AQB543, parked in the same spot where the Honda Civic and the Hyundai Sonata previously parked.

b)    At approximately 5:12 a.m., the CI texted NEVAREZ-ERUNEZ at the -2955 number and asked if he could order more methamphetamine.

c)    At approximately 5:52 a.m., NEVAREZ-ERUNEZ texted the CI and said he could only get ten additional pounds.  The CI confirmed that s/he wanted the extra ten pounds.

d)    At approximately 6:40 a.m., law enforcement saw NEVAREZ-ERUNEZ load a

9

duffle bag and a box into the Kia Forte.  NEVAREZ-ERUNEZ got in the car and drove to Sacramento, California to the meet location.

25.     At approximately 12:45 p.m., law enforcement officers arrested NEVAREZ-ERUNEZ pursuant to the arrest warrant.  In the vehicle he drove to Sacramento, NEVAREZ-ERUNEZ possessed forty pounds of apparent methamphetamine and five thousand blue pills, depicted below.  The evidence is being sent to the DEA lab for further testing.  Law enforcement did not field test the apparent methamphetamine or the blue pills out of concern for officer safety, given the prevalence of fentanyl-laced methamphetamine and fentanyl-laced counterfeit oxycodone pills.



26.     Law enforcement searched NEVAREZ-ERUNEZ and found the Device.

27.     The Device is currently in the lawful possession of the Homeland Security Investigations.  It came into the Homeland Security Investigations' possession when it was seized incident to NEVAREZ-ERUNEZ's arrest.  Further, after being advised of his *Miranda* rights and agreeing to speak with law enforcement, NEVAREZ-ERUNEZ signed a consent form for officers to search his phone.  Therefore, while the Homeland Security Investigations might already have all necessary authority to examine the Device, I seek

this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

28.     The Device is currently in storage at Homeland Security Investigations, located at 650 Capitol Mall in Sacramento, California..  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Homeland Security Investigations.

## V.     TECHNICAL TERMS

29.      Based on my training and experience, I use the following technical terms to convey the following meanings:

a)     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b)     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c)   Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d)   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e)   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

g)   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other

13

are in the same state.

30.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VI.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

32.     <u>Forensic evidence.</u>  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b)     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

14

d)  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

33.  <u>Nature of examination.</u>  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34.  <u>Manner of execution.</u>  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VII.  <u>CONCLUSION</u>

35.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

36.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary

because the warrant is relevant to an ongoing investigation into the criminal organizations as not all the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Nelson S. Torres
Nelson S. Torres
Special Agent
Homeland Security Investigations

Subscribed to me and sworn telephonically on:  October 12, 2022

The Honorable Jeremy D. Peterson
United States Magistrate Judge

Approved as to form by:

Emily G. Sauvageau
Assistant United States Attorney

## <u>ATTACHMENT A</u>

The property to be searched is a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, hereinafter the "Device."  The Device is currently located at Homeland Security Investigations, located at 650 Capitol Mall in Sacramento, California.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Device described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a), 846 and involve Julio NEVAREZ-ERUNEZ, including:

1.      All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the subject individuals during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

        a.  Incoming call history;

        b.  Outgoing call history;

        c.  Missed call history;

        d.  Outgoing text messages;

        e.  Incoming text messages;

        f.  Draft text messages;

        g.  Telephone book;

        h.  Data screen or file identifying the telephone number associated with the
mobile telephone searched;

        i.  Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

        j.  Voicemail;

        k.  User-entered messages (such as to-do lists);

        l.  Photographs;

        m. Lists of customers and related identifying information;

        n.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

        o.  Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    p. All bank records, checks, credit card bills, account information, and other financial records; and

    q. Any passwords used to access the electronic data described above.

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.    This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, CURRENTLY LOCATED AT HSI Sacramento | )<br>)<br>)  Case No.   2:22-sw-0703 JDP<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____October 26, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   _____October 12, 2022 at 10:14 a.m._____          *Judge's signature*

City and state:      _____Sacramento, California_____          _____Jeremy D. Peterson, U.S. Magistrate Judge_____
                                                                                                                          *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

_____          _____
           Signature of Judge                                                    Date

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>grey Apple iPhone 12, with serial number<br>G6TFMGJ10D80, IMEI number 358522145066107,<br>and phone number (562) 399-2955, CURRENTLY<br>LOCATED AT 650 Capitol Mall, Suite 3-100,<br>Sacramento, CA | )<br>)<br>)  Case No.   2:23-sw-0023 JDP<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____January 27, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      ___January 13, 2023 at 3:05 p.m.___           _____
                                                                                                              *Judge's signature*

City and state:      ___Sacramento, California___            ___Jeremy D. Peterson, U.S. Magistrate Judge___
                                                                                          *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

| _____ | |
|---|---|
| Signature of Judge | Date |

## <u>ATTACHMENT A</u>

The property to be searched is a grey Apple iPhone 12, with serial number G6TFMGJ10D80, IMEI number 358522145066107, and phone number (562) 399-2955, hereinafter the "Subject Device."  The Subject Device is currently located at 650 Capitol Mall, Suite 3-100, Sacramento, CA.

This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the Subject Device described in Attachment A that relate to violations of 18 U.S.C. § 2252A(a)(2)&(5) and involve Julio NEVAREZ-ERUNEZ, including:

    a.   Visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or describing such conduct;

    b.   Video recordings of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    c.   Information, electronic records, or correspondence pertaining to the possession, receipt, or distribution of visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    d.   Information regarding social-networking Internet sites or peer-to-peer networks and participants in such sites or networks;

    e.   Correspondence including, but not limited to electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    f.   Records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

    g.   Credit card information, including bills and payment records showing subscriptions, membership payments, purchases, or sales of visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or for access to such material.

    h.   Records, electronic or otherwise, or other items that relate to peer-to-peer software or networks, or to use of such software or networks by individuals who exhibit a sexual interest in children.  Evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    i.   Evidence of who used, owned, or controlled the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, electronically-stored photographs, and correspondence;

j.  Any and all stored information that can be retrieved and investigated for evidentiary value, inculpatory or exculpatory, and/or identify co-conspirators, and identify any investigatory leads.

2.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.